United States District Court
Northern District of Indiana

JOHNNY STOVALL,

        Plaintiff,

        v.                                            Civil Action No. 1:11-CV-333 JVB

GLENBROOK DODGE INC., d/b/a
GLENBROOK DODGE CHRYSLER JEEP,

        Defendant.

**ORDER**

This matter is before the Court on cross motions for summary judgment (DE 32 and 41). Defendant has also moved to strike the affidavit of Plaintiff's expert witness, Edward Ford Jr. (DE 43). Plaintiff has filed a motion for a hearing on its motion for summary judgment (DE 34).

**A.    Legal Standard**

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

These principles apply equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774 (7th Cir.1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.,* 335 F.3d 643, 647 (7th Cir.2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.,* 246 F.3d 975, 983 (7th Cir.2001) (quoting *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 692 (7th Cir.1998)).

**B.     Facts**

On February 3, 2011, Plaintiff Johnny Stovall signed a Retail Installment Contract and Security Agreement ("first RISC") regarding a used Chrysler vehicle.  (DE 33-1 at 3–6.) Glenbrook Dodge Chrysler Jeep was named in the first RISC as the seller in the transaction. The first RISC includes a section entitled "Truth in Lending Disclosure" which sets out an annual percentage rate, finance charge, amount financed, total of payments and total sales price for the vehicle, but does not explicitly state who the creditor in the transaction is.

The first RISC also contains a section headed "Assignment."  Below this heading, the preprinted form provides: "This Contract and Security Agreement is assigned to _____, the Assignee."  In the blank, the words "Chase Custom Finance" are typed. In the same section there is a blank line for the signature of the seller to effectuate the assignment.  No signature appears.

In a section of the first RISC designated "Sales Agreement," the following language appears:

> **Payment.**  You promise to pay us the principal amount of $13,865.00 plus finance charges accruing on the unpaid balance, at the rate of 14.250% per year from the date of this Contract until paid in full.  Finance charges accrue on a 365 day basis.  You agree to pay this Contract according to the payment schedule and late charge provisions shown in the Truth-In-Lending Disclosures.

(DE 33-1 at 4.)

In the signature box on the first RISC, directly above the signature lines is a merger clause: "Entire Agreement.  Your and our entire agreement is contained in this Contract.  There are no unwritten agreements regarding this Contract.  Any change to this Contract must be in writing and signed by you and us."  (DE 33-1 at 4.) Another section of the first RISC provides,

3

under the heading "Additional Terms of the Sales Agreement," that the pronouns "us" refers to "the Seller and any entity to which it may transfer the Contract." (DE 33-1 at 5.)

Also on February 3, 2011, Stovall signed a one-page document entitled "Supplement to Installment Sales Contract."  It provides:

> Buyer understands and agrees that the sale and delivery of the motor vehicle described in the attached Installment Sale Contract is conditioned upon approval and acceptance of the terms of said Installment Sale Contract by a finance company or bank to be selected by Seller.  In the event the terms of said Installment Sale Contract are not acceptable to such finance company, Seller shall be relieved of further obligation or liability to deliver said motor vehicle to buyer [sic]; provided, however, that Seller is hereby authorized to attempt to obtain other financing arrangements for Buyer, the terms of said alternative financing are acceptable to both Seller and Buyer, obligations for the sale and purchase of the said vehicle will be continuing and in force.  If Seller is unable to obtain alternative financing for Buyer or if such alternative financing arrangements are not acceptable to Buyer, Buyer shall immediately return and deliver said motor vehicle to Seller at Seller's place of business . . . Buyer will pay a rental fee for the vehicle while in the Buyer's possession.  The rental fee is $25.00 per day and $0.15 per mile driven.

(DE 33-1 at 7.)  The Supplement also states that the Buyer will pay a rental fee of $25 per day and $0.15 per mile while the vehicle is in the Buyer's possession.

After signing these documents, Stovall made a $1,000 down payment and left Glenbrook with the Chrysler.  Glenbrook offered the first RICS to Chase for assignment but Chase rejected the credit terms set out in the first RISC.

On or after February 4, 2011, a Glenbrook employee drove to Stovall's residence to have him sign a new RISC.  The second RISC was identical to the first except for the figures in the Truth-In-Lending disclosures and the signatures.  The interest rate of 13.25% was one percentage point lower than in the first RISC, which made all the other figures lower, and reduced the monthly payment from $353.17 to $346.74.  The second RISC was signed by both

Stovall and his daughter, Stacey Stovall Haywood. It was back-dated to February 3, 2011. Stovall and Haywood did not sign a new Supplement to Installment Sales Contract when they signed the second RISC.

Glenbrook submitted the terms of the second RISC for Chase's approval, but Chase once again refused approval. Glenbrook notified Stovall that he had to return the car, which Stovall did. Glenbrook did not return any portion of the $1,000 down payment Stovall had made. Instead it offset the rental fee and mileage charges provided for in the Supplement to Installment Sales Contract, which came to more than $1,000.

Stovall maintains that Glenbrook was a creditor as defined in the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., and that it violated TILA disclosure requirements by making illusory disclosures and failing to identify itself as the creditor in the transaction. He also claims both that the "Supplement to Installment Sales Contract" did not become a part of the transaction and that requiring Stovall to sign it violates TILA because it purports to condition financing on a later event, which makes the disclosures meaningless. Stovall further asserts violations of the Equal Credit Opportunity Act, the Indiana Uniform Commercial Code, and the Indiana Crime Victims Relief Act.

**C.     Discussion**

**(1)     *Motion to Strike***

Stovall submitted the Affidavit of Edward Ford Jr. in support of his motion for summary judgment (DE 33-1 at 12–20). Ford has more than ten years of experience as a finance and insurance manager for various automotive dealerships and has been directly involved in more

than 10,000 motor vehicle transactions. In forming the opinions expressed in his affidavit, he considered pages eight and nine of the Amended Complaint, a RISC signed February 3, 2011, the title history of the Chrysler, credit reports for Stovall and Haygood, and had phone conferences with both of them. However, he stated in his deposition that the phone conferences had no influence on his opinions; he had already reached his conclusions when he spoke with Stovall and Haygood. He did not read Stovall's deposition or the deposition of Glenbrook's representative, Ryan Tuttle.

Ford offered certain opinions and assertions of fact in his affidavit, all of which Glenbrook has moved to strike. The Court paraphrases Ford's opinions as follows:

8(a) Glenbrook delivered the Chrysler to Stovall to take him out of the car-buying market while it determined whether it could sell the RISC without recourse or whether to change the deal.

8(b) The purpose of the transaction, called "spot delivery" was to convince Stovall he had bought and financed a car, while Glenbrook secretly intended to change the terms of transaction to its own advantage.[1] Spot delivery is often employed by dealers as a bait and switch scheme to the dealer's advantage and the consumer's disadvantage, the bait being the first RISC and the switch being a second RISC with different terms.

8(c) Spot delivery is used to give the dealership time to find an assignee to buy a

---

[1] Ford does not attempt to define spot delivery. The State of Georgia Governor's Office of Consumer Protection defines it as a transaction with an automobile business in which "the buyer takes possession of the vehicle 'on the spot,' upon making a commitment to buy or lease on installment, but not yet having a definite arrangement for financing . . . ." *Spot Delivery Pitfalls*, http://consumer.georgia.gov/consumer-topics/spot-delivery-pitfalls? (Last visited July 17, 2013).

buyer-signed RISC at face value without recourse while the consumer in possession of the car falls in love with it. Glenbrook might use spot delivery to take the consumer out of the market without intending to assign the RISC, planning instead to get the consumer to enter into a new RISC with financing terms more advantageous to it. If an assignee will not buy the RISC without recourse, Glenbrook will revoke the RISC and repossess the vehicle. If Glenbrook successfully assigns the RISC as written, the assignee becomes the servicer of the contract. Many assignees pay the dealer a premium in the form of an interest rate discount of which the consumer is unaware.

8(d)   By using the RISC and Supplement to Installment Sales Contract together, Glenbrook claims that it is not the creditor in its finance transactions and that it can change any term in a signed RISC.

8(e)   Assignments to third parties are made by a separate contract between Glenbrook and the third party. Such an agreement requires Glenbrook to have an assignable interest in the RISC, which interest is its contractual right to receive the monthly installment payments from the buyer.

8(f)   Glenbrook has written agreements with credit reporting agencies ("CRAs") and has certified to the CRAs that it is a creditor for the purpose of extending credit to its customers.

8(g)   Glenbrook can always assign its RISCs regardless of the terms by assigning with full recourse, limited recourse, or by guaranteeing the loan.

8(h)   In spot delivery transactions using a buyer-signed RISC, Glenbrook alone makes

7

the decision to extend and revoke credit to consumers, including Stovall.

9. Dealerships use spot delivery to avoid any contract obligation as a creditor by getting the customer to sign a "Supplement to Installment Sales Contract" without explaining it, allowing the dealership to claim that a financial institution will be the creditor.

10. Sales and finance employees easily mislead customers by directing them to signature lines on many documents, telling them that all the documents are required to complete the purchase and financing.

11. Some of the documents Stovall signed in this case included a credit application, insurance forms, powers of attorney, privacy act notice, buyer's order, title application, odometer disclosure statement, purchase contract, and RISC. The sales process is conducted to convince the consumer that he is buying a car at certain credit terms. Stovall was unaware that he signed a form providing that the credit contract was of no effect unless Glenbrook assigned the RISC without recourse.

11(a) The provision in the Supplement to Installment Sales Contract that the sale and delivery of the Chrysler are conditioned on the acceptance of the terms of the Installment Sales Contract by a financial institution and that if the terms are not acceptable Glenbrook has no obligation to deliver the Chrysler to the buyer is false.

11(b) The "Supplement to Installment Sales Contract " is false because financing is not beyond Glenbrook's control; it can always assign a RISC by agreeing to full

8

    recourse or limited recourse, or by guaranteeing the contract.

11(c) If the proposed assignee will not accept a RISC on a non-recourse basis, Glenbrook will offer the consumer one or more of the following options: sign a new RISC with different credit terms, obtain a cosigner, or surrender the purchased vehicle.

12. All of Ford's opinions apply to the transactions between Glenbrook and Stovall, which is a classic case to spot delivery used to remove Mr. Stovall from the market and avoid assigning the RISC with recourse or guaranteeing the loan.

  Glenbrook argues that Ford's opinions should be stricken because he does not have personal knowledge of the events and does not have a sufficient factual basis for the opinions expressed in his affidavit. Glenbrook claims Ford's opinions as to its intentions and motivations are nothing but speculation and that some of his opinions are improper legal conclusions. Stovall counters that an expert is permitted latitude to offer opinions not based on firsthand knowledge.

  While Ford may be an expert with regard to financing practices at car dealerships generally, his expertise does not extend to divining Glenbrook's secret intentions and motivations. Accordingly, the Court will strike those portions of ¶¶ 8(a), 8(b), and ¶ 8(c) of Ford's affidavit that state what Glenbrook's intentions were. Paragraphs 8(d) and 8(e) are legal arguments rather than opinions within Ford's expertise. They will be stricken. Paragraph 8(f) is a legal opinion as to the meaning of language in contracts with credit reporting agencies. It will be stricken. Ford has shown no basis for his conclusions in ¶¶ 8(g) and 8(h). They will be stricken.

Paragraphs 9 and 10 will be disregarded to the extent they purport to state how Glenbrook conducted the transaction with Stovall, because the record shows that he has no knowledge of how this particular transaction was handled. For the same reason, ¶ 11 will be disregarded to the extent Ford asserts Stovall's unawareness of the effect of the papers he signed and claims to know what documents Stovall actually signed in this transaction. His conclusions in ¶¶ 11(a) and 11(b) that a portion of the Supplement to Installment Sales Contract is false will be stricken as not helpful to the Court. The contract provision he labels as false is not a statement of fact; therefore it cannot be true or false. The Court will strike ¶ 11(c) because it asserts as facts what Glenbrook's practices are when it fails to assign a RISC although Ford has no personal knowledge of its practices. Finally, Ford's statement in ¶ 12 that all his opinions apply directly to the transactions between Glenbrook and Stovall and his assertion of Glenbrook's intent will be stricken for lack of basis.

**(2)**   *Truth in Lending*

The purpose of the Truth in Lending Act ("TILA") is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . . ." 15 U.S.C. § 1601(a). TILA requires the creditor in a transaction to disclose, among other things, the identity of the creditor making the disclosures, the amount financed, the finance charge, the annual percentage rate, the payment schedule, the total of payments, and the total sales price. 15 U.S.C. § 1638(a) and 12 C.F.R. § 226.18. The disclosures must be made before a consumer becomes contractually obligated on a credit transaction. 12 C.F.R. §226.17(c)(1).

Title 15 U.S.C. § 1602(g) defines "creditor:"

The term "creditor" refers only to a person who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness . . . .

In order to determine whether Glenbrook violated TILA disclosure rules, the Court must first decide whether it was a creditor. This depends, in part, on whether the Supplement to Installment Sales Contract Stovall signed became part of the contract between the parties or is excluded by the parol evidence rule, as Stovall maintains.

The first step in analyzing a parol evidence issue is to determine whether the parties' written contract is a complete integration of their agreement. *Hinkle v. Sataria Distrib. & Packaging Inc.*, 920 N.E.2d 766, 769 (Ind. Ct. App. 2010). Stovall argues that the existence of the merger clause in the RISCs prevents the Supplement from becoming part of the contract. However, the existence of a merger clause is not conclusive of the parties' intent. The Court must consider a merger clause along with all other relevant evidence on the question of integration. *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986).

On the basis of the evidence, the Court must conclude that the RISCs and the Supplement were intended to be part of the same agreement, the merger clause in the RISCs notwithstanding. The RISCs and the Supplement were dated the same day and concern the same subject matter. Stovall's conduct suggests that he understood that the sale of the Chrysler was conditioned on Glenbrook's obtaining financing from an third party as provided in the Supplement. After all, he signed a new RISC when Glenbrook informed him it could not get financing on the terms set out in the first RISC and returned the Chrysler when he was told financing could not be secured on

11

the terms set out in the second RISC.

The Court further determines that the Supplement created a condition precedent to Glenbrook's duty to sell the Chrysler that was never fulfilled. Because Glenbrook was never obligated to sell the Chrysler it could not be the creditor in the transactions. The effect of the RISCs and the Supplement together was to make the transactions applications for credit to third parties on the terms set out in the RISCs. Glenbrook is not the person to whom the debt arising from the consumer credit transaction was initially payable on the face of the evidence of indebtedness; no debt arose because of the failure of the condition precedent. Moreover, even if it can be said that the transaction between Stovall and Glenbrook created a debt initially payable to Glenbrook, Stovall designated no evidence to establish that Glenbrook regularly extends credit. Because Glenbrook does not qualify as a creditor as defined in TILA it cannot be liable for failing to make TILA disclosures.

**(3)** *Equal Credit Opportunity Act*

The Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, et seq., was enacted to protect consumers from credit denials for discriminatory reasons such as age, race, religion, national origin, gender, marital status and source of income. 15 U.S.C. § 1691(d). Stovall maintains Glenbrook has violated ECOA, and Regulation B, 12 C.F.R. § 201, et seq., because it failed to provide Stovall with written notification of the reasons for its adverse credit action as to him. In Stovall's view, the adverse action was its demand that he return the Chrysler after Glenbrook was unable to assign the second RISC.

Title 15 U.S.C. § 1691(d), requires that:

12

(1) Within thirty days (or such longer reasonable time as specified in regulations of the Board for any class of credit transaction) after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—

(A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

Glenbrook argues that it is not a creditor within the meaning of the ECOA when it comes to the duty to provide notification of an adverse action. Title 15 U.S.C. § 1691a(e) defines creditor as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." Regulations implementing the Act are found at 12 C.F.R. §§ 202.1–202.15, commonly referred to as "Regulation B." The definition of "creditor" is refined in 12 C.F.R. § 202.2(1):

Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made.

Sections 202.4(a) and (b) concern discrimination and discouragement on prohibited bases in

credit transactions. While Glenbrook concedes that it is a creditor for those purposes because it regularly refers applicants to creditors, it insists it is not a creditor for the purpose of providing statements of reasons for adverse credit decisions. The Court agrees. Stovall has designated no evidence to show that Glenbrook, in the ordinary course of its business, regularly participates in credit decisions. Instead, when read together, the RISC and Supplement point to the conclusion that Stovall was not applying for credit from Glenbrook, and that Chase, not Glenbrook, made the credit decisions as to both the first and second RISC. Where an automobile dealer's role is limited to sending credit applications to potential lenders, it is not a creditor for the purposes of the notice requirements of the ECOA. It is the potential lender, rather than the dealer, that makes the credit decision. *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 980, n8. (7th Cir. 2004). Accordingly, Glenbrook had no duty to provide a statement of reasons for the denial of credit by Chase and did not violate ECOA.

**(4)** *State Law Claims*

Supplemental jurisdiction over state law claims is governed by 28 U.S.C. §1367(c). The general rule is that, when all federal claims are dismissed before trial, the pendent state claims should be left to the state courts. *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). Accordingly, Plaintiff's claims arising under Indiana law will be dismissed without prejudice.

**D.     Conclusion**

For the foregoing reasons, Defendant Glenbrook Dodge's motion to strike (DE 43) is GRANTED;  Plaintiff Johnny Stovall's motion for partial summary judgment (DE 32) is DENIED; Stovall's motion for a hearing (DE 34) is DENIED; and Glenbrook's motion for summary judgment (DE 41) is GRANTED as to his claims under the Truth in Lending Act and the Equal Credit Opportunity Act.  His state law claims are DISMISSED without prejudice.  There being no issues for trial, the Clerk of the Court is directed to enter final judgment in favor of Defendant Glenbrook Dodge Inc.

SO ORDERED on August 23, 2013.

s/ Joseph S. Van Bokkelen
Joseph S. Van Bokkelen
United States District Judge
Hammond Division